# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**09-60033 CR-MARRA** **CHOPKINS**

CASE NO. _____ CR-MARRA

18 U.S.C. § 371

UNITED STATES OF AMERICA

vs.

UBS AG,

      **Defendant.**

_____/

## INFORMATION

The United States charges that:

### INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

1.      The Internal Revenue Service ("IRS") was an agency of the United States Department of Treasury responsible for administering and enforcing the tax laws of the United States and collecting the taxes owed to the Treasury of the United States.

2.      UBS AG ("UBS") was Switzerland's largest bank. UBS owned and operated banks, investment banks, and stock brokerage businesses throughout the world, also operating in the Southern District of Florida and elsewhere in the United States. Because of UBS's ownership of banks and investment brokerages in the United States, United States tax laws applied to UBS and to its United States clients.

3.      UBS operated a cross-border banking business with United States clients ("United States cross-border business"). The United States cross-border business employed approximately

1

60 private bankers and had offices in Geneva, Zurich, and Lugano, Switzerland. These private bankers frequently traveled to the United States to meet with and to conduct business with their United States clients.

4.     The United States cross-border business provided private banking services to approximately 20,000 United States clients with assets worth approximately $20 billion. Approximately 17,000 of the 20,000 cross-border clients concealed their identities and the existence of their UBS accounts from the IRS. Many of these clients willfully failed to pay tax to the IRS on income earned on their UBS accounts. UBS assisted these United States clients conceal the income earned on UBS accounts by failing to report IRS Form 1099 information to the IRS. From 2002 through 2007, the United States cross-border business generated approximately $200 million a year in revenue for UBS.

**The Conspirators**

5.     Some UBS executives ("Executives") are unindicted co-conspirators not named as defendants herein. These Executives occupied positions at the highest levels of management within UBS, including positions on the committees that oversaw legal, compliance, tax, risk, and regulatory issues related to the United States cross-border business.

6.     Some UBS employees who managed the United States cross-border business ("Managers") are unindicted co-conspirators not named as defendants herein. These Managers were responsible for overseeing the United States cross-border business operations. These Managers were responsible for regulatory and compliance issues, as well as issues related to bankers' incentives and compensation. These Managers were also responsible for traveling to the United States to meet with UBS's wealthiest United States clients. These Managers reported directly to Executives.

2

7.     UBS employees who managed the bankers servicing the United States cross-border business ("Desk Heads") are unindicted co-conspirators not named as defendants herein. These Desk Heads exercised direct management over the day-to-day operations of the business. In addition to having management duties, Desk Heads traveled to the United States to conduct unlicensed banking and investment advisory activity for UBS's United States clients. These Desk Heads reported directly to Managers.

8.     UBS private bankers who serviced the United States clients ("Bankers") are unindicted co-conspirators not named as defendants herein. These Bankers were not licensed to engage in banking and investment advisory activity in the United States. However, these Bankers routinely traveled to the United States to conduct unlicensed banking and investment advisory activity for UBS's United States clients. While in Switzerland, these Bankers routinely communicated with their clients in the United States about banking and investment advice. These Bankers reported directly to the Desk Heads. UBS Executives and Managers authorized and encouraged through incentives Bankers' activities with respect to their United States clients.

9.     Some of UBS's 20,000 United States clients are unindicted co-conspirators not named as defendants herein. These United States clients knowingly concealed from the United States government, including the IRS, approximately $20 billion in assets held at UBS and willfully evaded United States income taxes owed on the income earned on these secret UBS accounts. United States clients were required to report and pay taxes to the IRS on income they earned throughout the world, including income earned from the UBS account.

3

## COUNT ONE
### (18 U.S.C. § 371)

10.    The allegations contained in paragraphs 1 through 10 of the Introduction are re-alleged and incorporated herein.

11.    From in or a time unknown to the Grand Jury and continuing up to and including the date of the return of this Indictment, in the Southern District of Florida, and elsewhere, the defendant,

### UBS AG,

together with its co-conspirators, did unlawfully, willfully and knowingly, combine, conspire, confederate and agree to defraud the United States and an agency thereof, to wit, the Internal Revenue Service of the United States Department of Treasury in the ascertainment, computation, assessment and collection of federal income taxes.

### OBJECT OF THE CONSPIRACY

12.    It was a part and an object of the conspiracy that defendant UBS and its co-conspirators would and did increase the profits of UBS by providing unlicensed and unregistered banking services and investment advice in the United States and other activities intended to conceal from the IRS the identities of UBS's United States clients, who willfully evaded their income tax obligations by, among other things, filing false income tax returns and failing to disclose the existence of their UBS account to the IRS.

4

## MEANS AND METHODS OF THE CONSPIRACY

Among the means and methods by which defendant UBS and its co-conspirators would and did carry out the conspiracy were the following:

13.     It was part of the conspiracy that defendant UBS, Executives, Managers, Desk Heads, and Bankers utilized nominee entities, encrypted laptops, numbered accounts, and other counter surveillance techniques to conceal the identities and offshore assets of United States clients from authorities in the United States.

14.     It was part of the conspiracy that UBS expanded their business beyond the borders of Switzerland by purchasing a large United States stock brokerage firm.  Executives at UBS voluntarily entered into an agreement, known as the Qualified Intermediary Agreement ("QI Agreement") with the IRS that required UBS to report to the United States income and other identifying information for its United States clients who held an interest in United States securities in an account at UBS.  Further, this agreement required UBS to withhold taxes from United States clients who directed investment activities in foreign securities from the United States.

15.     It was part of the conspiracy that UBS, Executives, and Managers entered into the QI Agreement and represented to the IRS that UBS was in compliance with the terms of the QI Agreement, while knowing that the United States cross-border business, was not conducted in a manner which complied with the terms of the QI Agreement.

16.     It was part of the conspiracy that UBS, Executives, and Managers mandated that Desk Heads and Bankers increase the United States cross-border business, knowing that this mandate would cause Bankers and Desk Heads to have increased unlicensed contacts with the United States, in violation of United States law and the QI Agreement.

17.     It was further part of the conspiracy that defendant UBS, Executives, and Managers, who referred to the United States cross-border business as "toxic waste" because they knew that it was not being conducted in a manner that complied with United States law and the QI Agreement, put in place monetary incentives that rewarded Desk Heads and Bankers who increased the United States cross-border business.

18.     It was further part of the conspiracy that Managers, Desk Heads, and Bankers solicited new investments in the United States cross-border business by marketing UBS secrecy to United States clients interested in attempting to evade United States income taxes, in particular by claiming that Swiss bank secrecy was impenetrable.

19.     It was further part of the conspiracy that Managers, Desk Heads, and Bankers provided unlicensed and unregistered banking services and investment advice to United States clients in person while on travel to the United States and by mailings, email, and telephone calls to and from the United States.

20.     It was further part of the conspiracy that, when approached about the continuous unregistered and unlicensed contacts with the United States associated with the United States cross-border business, defendant UBS and Executives would not implement effective restrictions on the United States cross-border business because the business was too profitable for UBS.

21.     It was further part of the conspiracy that UBS, Managers, and Bankers assisted United States clients conceal their beneficial ownership in UBS accounts from the IRS by assisting United States clients create nominee offshore structures and by transferring assets of United States clients into UBS accounts in the name of the nominee offshore structure.

22.     It was further part of the conspiracy that Managers, Desk Heads, and Bankers assisted

6

United States clients in preparing IRS Forms W-8BEN that falsely and fraudulently stated that nominee offshore structures, and not the United States clients, were the beneficial owners of offshore bank and financial accounts maintained in foreign countries, including accounts in Switzerland at UBS.

23.     It was further part of the conspiracy that some United States clients prepared and filed with the IRS income tax returns that falsely and fraudulently omitted income earned on their undeclared UBS account and that falsely and fraudulently reported that United States citizens did not have an interest in, or a signature or other authority over, financial accounts located in a foreign country.

24.     It was further part of the conspiracy that the United States clients failed to file with the Department of Treasury a Report of Foreign Bank and Financial Accounts, Form TD F 90-22.1, which would have disclosed the existence of and their interest in, or signature or other authority over, a financial account located in a foreign country.

## OVERT ACTS

In furtherance of the conspiracy and to achieve the object and purpose thereof, at least one of the co-conspirators committed at least one of the following overt acts, among others, in the Southern District of Florida and elsewhere:

25.     On or about July 6, 2000, a Manager authorized Bankers to refer United States clients to outside lawyers and accountants to create offshore structures to conceal from the IRS United States clients' UBS accounts, while knowing that creating these structures constituted helping the United States clients commit tax evasion.

26.     On or about July 14, 2000, Managers changed the wording on UBS Document 61393,

7

Declaration for US Taxable Persons, from "I would like to avoid disclosure of my identity to the US IRS" to "I consent to the new tax regulations . . . ." after United States clients expressed fears that the form as originally drafted could be used as evidence against them for tax evasion.

27.    On or about July 11, 2002, a Manager and others instructed Bankers to tell United States clients who were contemplating transferring their assets to another offshore bank that UBS has the largest number of United States clients among all banks outside the United States, creates jobs in the United States, has better lobbying possibilities in the United States than any other foreign bank and would not be pressured by United States authorities to disclose the clients' identities.

28.    On or about September 19, 2002, Executives on UBS's executive board knowingly failed to disclose to the IRS deficiencies in implementing UBS's requirements to report and withhold taxes for clients of the United States cross-border business that were discovered after the completion of an internal audit.

29.    On or about September 26, 2002, a Desk Head instructed Bankers that if they have unauthorized contact with United States clients in the United States, that the Bankers should  not report the contact in UBS's internal computer system.

30.    In or about December 2002, Executives authorized Managers, to institute a temporary five month travel ban to the United States.  The ban coincided with an IRS initiative relating to identifying holders of offshore credit cards.

31.    On or about January 22, 2003, after being advised by outside lawyers to take immediate action in order to build a defense against a possible future criminal case brought against UBS, a Manager instructed another Manager to limit written communications relating to offshore structures created for United States clients and instructed that Manager to begin issuing Form 1099

information to clients, but not to the IRS, for certain UBS accounts where UBS officials served as a manager for the offshore structures.

32.     On or about January 24, 2003, Managers issued a form letter to United States clients reminding them that since at least 1939 UBS has been successful in concealing account holder identities from United States authorities and that even after UBS's presence in the United States recently increased after the purchase of a large United States brokerage firm, UBS was still dedicated to the protection of their identities.

33.     On or about July 9, 2004, UBS represented to the IRS that its United States based operations had failed to provide Form 1099 information to the IRS, failed to withhold the appropriate tax when required to do so, and failed to properly document the owners of certain accounts, but failed to inform the IRS that the United States cross-border business continued to fail to provide Form 1099 information to the IRS, continued to fail to withhold the appropriate tax when required to do so, and continued to fail to properly document the owners of certain accounts.

34.     On or about August 17, 2004, Managers organized a meeting in Switzerland with outside lawyers and accountants to discuss the creation of structures and other vehicles for clients who wanted to conceal their UBS accounts and income derived therefrom tax authorities in the United States and Canada.

35.     In or about September 2004, Desk Heads and Bankers received training in Switzerland on how to avoid detection by authorities when traveling in the United States on UBS business.

36.     During calendar year 2004, approximately 32 Bankers traveled to the United States and met with United States clients approximately 3,800 times to provide unlicensed and unregistered

banking services and investment advice relating to the clients' UBS account.

37.     On or about April 15, 2005, a United States client identified as I.O. filed his United States Individual Income Tax Return, Form 1040, for the 2004 tax year, listing an address in Lighthouse Point, Florida, that fraudulently omitted income earned from offshore assets and falsely represented that I.O. did not have an interest in, and signature and other authority over, financial accounts located in a foreign country.

38.     On or about April 25, 2005, Executives instructed Managers, Desk Heads, and Bankers to grow the United States cross-border business.

39.     In or about early December 2005, Desk Heads and Bankers solicited new business from existing and prospective United States clients at Art Basel Miami Beach in Miami Beach, Florida.

40.     On or about March 31, 2006, Executives enacted restrictions that would have "little" or "some impact" on the profitability of the United States cross-border business.

41.     In or about August 2006, Executives refused to approve the recommendations of Managers to wind down, sell, or spin off the United States cross-border business, as too costly and requiring public disclosures that would harm UBS.

42.     On or about September 26, 2006, Desk Heads and Bankers were trained at UBS on how to conduct business discreetly by using mail that would not show UBS's name and address, by changing hotels while traveling, and by using encrypted laptop computers when traveling to the United States on UBS business and when meeting with United States clients.

All in violation of Title 18, United States Code, Section 371.


_____

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY


_____

KEVIN M. DOWNING
MICHAEL P. BEN'ARY
TRIAL ATTORNEYS


_____

JEFFREY A. NEIMAN
ASSISTANT U.S. ATTORNEY


11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

vs.

UBS AG,

_____ **Defendant.** /

CASE NO. _____

## CERTIFICATE OF TRIAL ATTORNEY*

**Superseding Case Information:**

New Defendant(s)      Yes _____   No _____
Number of New Defendants
Total number of counts

**Court Division:** (Select One)

__X__ Miami   _____ Key West
__X__ FTL     _____ WPB   _____ FTP

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter: (Yes or No) _____
List language and/or dialect _____

4. This case will take ___1___ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

    (Check only one)

    | | | | (Check only one) | |
    |---|---|---|---|---|
    | I | 0 to 5 days | __X__ | | |
    | II | 6 to 10 days | _____ | Petty | _____ |
    | III | 11 to 20 days | _____ | Minor | _____ |
    | IV | 21 to 60 days | _____ | Misdem. | _____ |
    | V | 61 days and over | _____ | Felony | __X__ |

6. Has this case been previously filed in this District Court? (Yes or No) __NO__
If yes:
Judge: _____ Case No. _____
(Attach copy of dispositive order)
Has a complaint been filed in this matter? (Yes or No) __NO__
If yes:
Magistrate Case No. _____
Related Miscellaneous numbers: 08-60322-CR-JIC _____
Defendant(s) in federal custody as of _____
Defendant(s) in state custody as of _____
Rule 20 from the _____ District of _____

Is this a potential death penalty case? (Yes or No) __NO__

7. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003? _____ Yes __X__ No

8. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007? _____Yes __X__ No

_____
JEFFREY A. NEIMAN
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No./Court No.: 544469

*Penalty Sheet(s) attached

REV 4/8/08